**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| SOFTWRITERS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:15-cv-01286-LPL |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| INTEGRA, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | *Electronically Filed* |
| | ) | |
| | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND**
**REQUEST FOR PRELIMINARY INJUNCTION HEARING**

---

REED SMITH LLP
Kirsten R. Rydstrom (SBN 76549)
Pa. ID. No. 76549
Email:    krydstrom@reedsmith.com
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222-2716
Telephone: (412) 288-7284
Facsimile: (412) 288-3063

-and-

ARNALL GOLDEN GREGORY LLP
Kevin B. Getzendanner
Georgia Bar No. 292425
Email: kevin.getzendanner@agg.com
Anuj Desai
Georgia Bar No. 193889
Email: anuj.desai@agg.com
171 17th Street NW
Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8500
Facsimile: (404) 873-8501

*Counsel for Defendants Integra LTC Solutions,*
*LLC and J M Smith Corporation*

## I.   INTRODUCTION

SoftWriters, Inc. ("SoftWriters") has launched a wholly unsubstantiated lawsuit—a trade secret claim that is missing any identifiable trade secrets, let alone any proof of misappropriation by Defendant Integra LTC Solutions, LLC ("Integra") or anyone else. A handful of pharmacy customers, shared by both companies, have used an Integra software utility called the EDIFACT Reader to access and transfer their non-proprietary electronic prescription data. This Reader permits the transfer of this prescription data from SoftWriters' FrameworkLTC ("Framework") database to Integra's DocuTrack database, in order for the pharmacies to serve the needs of their patients on a day-to-day basis.

This lawsuit, though, is not about whether mutual customers can use an interface between the two companies' computer programs; they have been doing so for years. Integra is a long-time industry peer of SoftWriters and, like SoftWriters, develops software for large institutional pharmacies that manage drug dispensing for large resident populations across multiple facilities. Historically, these mutual customers have used a software interface to support their business workflow between Integra's DocuTrack application and SoftWriters' Framework system.

The lawsuit likewise is not about whether these customers can transfer data from one software application to another; also for years, SoftWriters has permitted and publicly encouraged its customers to export a variety of data from their Framework software to give these customers the utmost flexibility in their business operations.

Indeed, SoftWriters strongly touts the "open" nature of Framework to its customers and potential customers.

And the lawsuit does not even seem to be predicated upon any credible belief by SoftWriters that its license agreement restricts customers from using the Reader. SoftWriters' interpretation of its license agreement—that it bars mutual pharmacy customers from freely moving their own standard format electronic prescription data from SoftWriters' database into others used by its customers—is highly questionable. In addition to the absence of any express restriction on data transfer, allowing a vendor to wall off electronic prescriptions runs counter to the interests of the pharmacies, their patients, and clear federal regulation and policy favoring interoperability of healthcare information systems.

Rather, this lawsuit is about the fact that SoftWriters now views Integra as a direct competitive threat, and as a result, seeks to hinder Integra in the market. Through selectively enforcing against its customers a self-serving and questionable interpretation of their SoftWriters license agreement, SoftWriters seeks to prevent them from doing business with Integra. The actual trade secrets claim is a proxy for this anti-competitive effort.

Since customers' use of the Reader does not and never did involve any trade secrets, SoftWriters cannot show any valid claim on the merits, much less a clear likelihood of success. At most three customers still use the Reader, so there is no emergency. Nor has SoftWriters made any showing of immediate irreparable harm as a result of the three customers still choosing, against Integra's recommendation, to use

the Reader. By contrast, the requested TRO, in addition to working competitive harm on Integra, would decidedly limit free exchange of patient e-prescription data, and the best interests of mutual customers.

Notably, SoftWriters now sells a product, ECM, that competes with DocuTrack. Its pending motion, like the follow-on demand for a fishing expedition in the form of expedited discovery, is transparently about trying to gain a competitive advantage at the expense of fair competition. The Court should deny the motion in its entirety.

## II.    STATEMENT OF FACTS

### A.    Integra and DocuTrack

Integra designs and develops software for institutional pharmacies, which, as compared to CVS, Walgreens, or other retail pharmacies, provide services under contract to large institutional customers like long-term care facilities. (Declaration of Kevin P. Welch dated Oct. 28, 2015 ("Welch Decl."), ¶ 3 a copy of the Welch Declaration is attached hereto as Exhibit 1.) One of these software solutions, DocuTrack, helps these large pharmacies manage content including prescription orders, refill orders, notes, electronic claims and billing/collections activity, and the like. (*Id.* ¶ 4.) Integra designed DocuTrack to be an open platform, meaning it can easily interface to other systems both within and external to the pharmacy. (*Id.* ¶ 5.)[1]

### B.    SoftWriters and Framework

One such system customers use is SoftWriters' Framework product, which is a

---

[1] Reserving all rights, Defendant J M Smith Corporation ("JMS"), Integra's parent company, joins in this Opposition. It is not clear on what basis Plaintiff has joined JMS, Integra's parent company, and Defendants believe such joinder is improper.

3

comprehensive pharmacy information system promoted by SoftWriters as compatible with other systems used by its customers. (*Id.* ¶ 6; *see also* Business Partner Integration, http://www.softwriters.com/company/business-partner-integration/(last accessed Oct. 28, 2015) (trumpeting "easy and robust integration" with a variety of other companies and pharmacy functions, Framework interface's accepting "NCPDP SCRIPT standard electronic prescription orders," and Framework's "open architecture and…certified Microsoft Windows technology [that] makes integration with new technologies simple.")

In fact, DocuTrack and Framework are presently used by approximately 180 mutual customers. (*Id.*) An existing bi-directional software interface, developed through collaboration and offered by both parties, allows customers to integrate their own DocuTrack and Framework systems and corresponding business workflows. (*Id.* ¶ 8.) This ability to interface is especially important to pharmacy customers because of the complexity of the healthcare and pharmacy workflow within and outside their organization, requiring use of a variety of different software systems. (*Id.* ¶ 5.)

So important is this concept of interoperability—that different healthcare technology programs and systems be able to communicate with each other, including by sharing health data in standard formats—that it is a centerpiece of federal legislation and ongoing regulation in the health IT arena:

> Critical to…the ultimate goal of a transformed health care system is real-time interoperable HIE [health information exchange] among a variety of healthcare stakeholders (clinicians, laboratories, hospital, pharmacy,

health plans, payers and patients) *regardless of the application or application vendor.*[2]

Historically, DocuTrack and Framework have served complementary functions for the companies' mutual customers. Recent events have put the companies in more direct competition. Beginning in 2013, Integra made the business decision to begin efforts to enter the pharmacy information system marketplace with a separate software solution, which would cause it to compete with SoftWriters' Framework product in the future. (*Id.* ¶ 7.) SoftWriters also now advertises a product, ECM, that is competitive with DocuTrack.[3] And on Aug 31, 2015, JMS announced its acquisition of the Integra business, and Integra's intention of "melding resources and expertise to further expand Integra's product line and service offerings to the institutional market."[4]

### C.    Customers need the ability to transfer their e-prescription data.

The particular software features at issue in this case pertain to electronic prescribing or e-prescribing. Increasingly prevalent and important to customers, e-prescribing is a "prescriber's ability to electronically send an accurate, error-free and understandable prescription directly to a pharmacy from the point-of-care."[5] For example, the physician at a nursing home admitting a patient may issue a prescription

---

[2] Principles and Strategy for Accelerating Health Information Exchange (HIE), The Office of the National Coordinator for Health Information Technology, https://www.healthit.gov/sites/default/files/acceleratinghieprinciples_strategy.pdf (last accessed October 27, 2015) (emphasis added).

[3] Framework ECM, http://www.frameworkltc.com/companion-products/frameworkecm/ (last accessed Oct. 28, 2015).

[4] J M Smith Acquires Integra Business, http://www.jmsmithcorp.com/about-us/news/j-m-smith-acquires-integra-nv-business/ (last accessed October 28, 2015).

[5] E-Prescribing, https://www.cms.gov/Medicare/E-Health/Eprescribing/index.html (last accessed October 28, 2015).

as a computerized physician order entry, which then is sent securely over the Internet to the institutional pharmacy to dispense, deliver and bill. (*Id.* ¶ 9.) The pharmacy, in turn, might request a medication history (MAR) or need to send the e-prescription data to a third-party payor (e.g., an insurance company) for reimbursement. (*Id.*)

This process of prescription data flow across systems only works because of well-established healthcare industry data standards. (Welch Decl. ¶ 9.) For e-prescribing information, the standard is called SCRIPT 10.6. Developed by the National Council for Prescription Drug Programs (NCPDP)[6] to make it easier to send e-prescriptions, SCRIPT 10.6 is endorsed by the federal government and is now incorporated into its regulations and requirements for Medicare reimbursement.[7] Under the "meaningful use" requirements of the HITECH Act, physician practices are now required to attest that they send more than 50% of all prescriptions electronically.[8]

Just as Integra's customers typically have the ability to instantly retrieve and review hundreds of thousands, if not millions, of ordinary prescription records stored within DocuTrack, they need to have the same capability for their electronic prescriptions. (Welch Decl. ¶ 11.) For this reason, i.e., to allow customers to manage

---

[6] NCPDP, http://www.ncpdp.org/NCPDP/media/pdf/EprescribingFactSheet.pdf (last accessed Oct. 28, 2015).

[7] 2016 Interoperability Standards Advisory at p. 20, https://www.healthit.gov/sites/default/files/2016_InteroperabilityStandardsAdvisoryFINAL.pdf (accessed Oct. 27, 2015) (identifying final and regulated adoption of 10.6 standard for new and refill prescription transactions) (last accessed Oct. 28, 2015).

[8] Eligible Professional Meaningful Use Core Measures, https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/downloads/Stage2_EPCore_2_ePrescribing.pdf (last accessed Oct. 28, 2015).

electronic prescriptions, Integra developed the eRX module of DocuTrack. (*Id.* ¶ 12.) With the eRX module, these customers can receive electronic prescriptions and can manage them within DocuTrack and process them in conjunction with their other pharmacy information systems. (*Id.*) More than fifty of Integra's DocuTrack customers are currently using the eRX module. (*Id.*)

**D.    Customers start using the EDIFACT Reader to view e-prescriptions in DocuTrack.**

Electronic prescription data in the standard SCRIPT 10.6 format can originate from a variety of sources, including directly from the prescriber or from pharmacy databases maintained by the parties' institutional customers. (*Id.* ¶ 13.) A SQL database, like SoftWriters' Framework database, is one potential source of such data. (*Id.*)

The existing interface these customers have installed between their DocuTrack and Framework systems does not presently support the transfer of SCRIPT 10.6 data. (*Id.*¶ 8.) Thus, if a pharmacy using Framework wants to view an e-prescription in DocuTrack, it needs another means of moving its data into DocuTrack's eRX module. It was for that reason that some mutual customers began making use of Integra's EDIFACT Reader. EDIFACT is the international standard (ISO 9735) for electronic data interchange (EDI). (*Id.* ¶ 14.) The term stands for Electronic Data Interchange For Administration, Commerce and Transport. (*Id.*) The EDIFACT Reader is a simple plug-in for the eRX module that, if licensed and installed, allows a customer to transfer its electronic prescription data in SCRIPT 10.6 format from any given SQL database of the

customer into DocuTrack. (*Id.*) The Reader is generic in nature, limited to reading and importing (not writing into a database) only SCRIPT 10.6 prescription data. (*Id.*)

Integra itself does not employ the EDIFACT Reader; its customers do. Integra made the EDIFACT Reader available to its customers in February of this year. (*Id.* ¶ 15.) Since then and until August 21, 2015, approximately sixteen (16) of the mutual DocuTrack-Framework customers installed the Reader to have the ability to transfer their electronic prescription data into their DocuTrack system from their Framework database.[9] (*Id.*) Of the customers who installed the Reader, Integra is aware of only six or seven actually using the tool in their business operations. (*Id.* ¶ 18.)

The Reader is installed at the customer's request, on the customer's DocuTrack server, and in the customer's facility. (*Id.* ¶ 17.) Prior to installing the Reader, each customer confirms in a signed agreement that it has the authority to access its data in the manner intended. (*Id.* ¶ 15.) The customer sets up the Reader according to a few pieces of basic configuration information, (*id.* ¶¶ 16-17), after which the Reader executes a single SQL query on a schedule set by the customer. A graphic depicting the customer's operation of the EDIFACT Reader is attached to this brief at Exhibit 2; as that exhibit reflects, all Reader operations occur on the customer's site.

> **E.    Only three customers still use the EDIFACT Reader today.**

Integra no longer installs the EDIFACT Reader. Integra first heard in August 2015 from one of its customers that SoftWriters took issue with the customer's

---

[9] The database used by Framework is built from a commonly used and extremely well-known relational database system licensed from Microsoft, known as Microsoft SQL Server. (Welch Decl. ¶ 6.)

extracting its own data from the Framework database. (*Id.* ¶ 19.) So, on or about August 21, 2015, Integra, as a precautionary matter, e-mailed all mutual customers who were using the EDIFACT Reader in their business to make them aware of this potential issue, asking them to resolve it directly with SoftWriters. (*Id.*) From August 21, 2015 until October 7, 2015, Integra followed up with its mutual customers using the EDIFACT Reader to verify that they had stopped using the utility, given SoftWriters' increasing aggression. (*Id.*) On October 7, 2015, Integra sent a follow up e-mail to the remaining four customers who appeared to still be using the Reader, again requesting that they discontinue use in view of SoftWriters' objection. (*Id.* ¶ 22.)

Integra also learned around this time, again from a customer, that SoftWriters has apparently installed or plans to install an "upgrade" of Framework that encrypts SCRIPT 10.6 data. (*Id.* ¶ 21.) Contrary to SoftWriters' allegations in this suit, Integra did not seek to discourage any customer from installing this upgrade. (*Id.*)

At present, Integra is aware of only three customers that have not uninstalled the EDIFACT Reader. (*Id.* ¶ 22.) Of those three, Integra did not hear back from one customer, and two others communicated that they wished to continue using it notwithstanding SoftWriters' objection. (*Id.*) As to these customers or any customer, shutting down the Reader without the customer's permission, as SoftWriters seeks to do, would imperil the customer's business. (*Id.* ¶ 23.) If Integra were to simply shut down a critical part of the customer's software used for managing electronic prescription information, it could have a very negative and disruptive impact on the customers and on the institutions and patients they serve. (*Id.*)

9

### F.    The EDIFACT Reader accesses only 10.6 data.

The only data a customer can transfer with the Reader is an NCPDP 10.6 message, i.e., an electronic prescription. (*Id.* ¶ 24.) The Reader does not have access to and cannot transmit Framework software code, software functions, software architecture, or any other alleged trade secret information, either internally to the customer's DocuTrack system or externally somehow to Integra. (*Id.*) Nor can the EDIFACT Reader permit access to (and Integra would have no need for) any information about Framework's supposed trade secret "database design," "database architecture" or "database management," or any scripts that might be embedded in the Framework database. (*Id.*) Moreover, the customers' use of the EDIFACT Reader does not provide Integra with any access to or ability to use the actual Framework software. (*Id.*)

### G.    SoftWriters proceeds despite the facts.

On September 1, 2015, SoftWriters' parent, Roper, sent Integra a demand letter accusing Integra of trade secret misappropriation. (*Id.* ¶ 20.) Notably, Roper sent this letter one day after the public announcement that JMS had acquired the Integra business. In a detailed response, Integra denied Roper's unfounded accusations, explained the actual facts concerning how customers were accessing their own SCRIPT 10.6 data within Framework, and invited a business meeting to discuss the matter. (*Id.*) Roper chose not to respond, and instead SoftWriters filed this lawsuit. (Welch Decl. ¶ 20.)

The Complaint contains the same unfounded speculation as Softwriters' initial

10

demand letter. *See* Rec. Doc. 1. After receiving it, Integra's counsel initiated multiple calls to share the details of Integra's efforts to have customers cease use of the EDIFACT Reader. Nonetheless, SoftWriters ramped up the litigation even further: Fifteen (15) days after filing its Complaint, SoftWriters moved for the instant TRO, demanding expedited discovery and that the Court set down a subsequent preliminary injunction hearing. Rec. Docs. 9 and 10.

In particular, based only on Count One of the Complaint (Misappropriation of Trade Secrets), Rec. Doc. 10 at 5, SoftWriters requests that the Court order Integra to (1) cease using SoftWriters' (unidentified) trade secret information, (2) destroy such (unidentified) trade secrets, if any, in Integra's possession, and (3) deactivate, not just the EDIFACT Reader, but the entire eRX module. Rec. Doc. 10 at 3-4.

For the reasons discussed below, there is no basis for such extraordinary relief, and given that any injunctive relief could harm the parties' mutual customers and their patients, the Court should deny SoftWriters' motion in its entirety.

### III.    ARGUMENT AND CITATION TO AUTHORITY

Though the factors for issuing a temporary restraining order are well-known, *see, e.g., Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp.2d 581, 589 (W.D.Pa. 2009), because SoftWriters seeks a mandatory injunction, i.e., one that that would alter the status quo, it is subject to an even higher standard of scrutiny. *See Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980) (declaring the burden is "particularly heavy" when mandatory relief is sought). Unless the facts and the law are <u>*clearly*</u> in favor of SoftWriters as movant, relief is not appropriate. *Sovereign Order of Saint John of Jerusalem-*

11

*Knights of Malta by Coleman v. Messineo*, 572 F. Supp. 983, 988-89 (E.D.Pa. 1983) (finding relief appropriate only when "the exigencies of the situation demand such relief and the facts and the law are clearly in favor of the moving party"). Thus, because SoftWriters cannot make a <u>clear</u> showing of its likelihood of success – and in fact, has no evidence that Integra or anyone else somehow misappropriated a SoftWriters' trade secret – its motion for extraordinary relief should be denied.

A.     **SoftWriters is not likely to succeed in its claim that customer use of the EDIFACT Reader did, or could ever, result in any trade secret misappropriation.**

1.     *SoftWriters fails to identify any trade secret*.

A threshold question for a trade secret misappropriation claim under PUTSA is whether or not the information at issue is an *actual* trade secret. *Fishkin v. Susquehanna Partners, G.P.*, 340 F.App'x 110, 118 (3d Cir. 2009). A trade secret, as defined under the statute, is:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa.C.S.A. § 5302. To be considered a trade secret, the information must be an "actual secret of peculiar importance to the business and constitute competitive value to the owner." *Youtie v. Macy's Retail Holding, Inc.*, 653 F.Supp.2d 612, 620 (E.D.Pa. 2009) (internal citation omitted). Courts in this Circuit consider various factors in evaluating

whether a trade secret exists. *Id.* (citing *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1255–56 (3d Cir. 1985)); *see also, MCQ's Enterprises, Inc. v. Philadelphia Parking Auth.*, No. CIV.A.07-0067, 2007 WL 127728, at *6 (E.D.Pa. Jan. 11, 2007) (denying TRO where it was unclear from the record that the information at issue qualified as a trade secret because plaintiff failed to show competitive advantage or value gained from the information and there was no evidence that information would be transferred to competitors (see discussion on irreparable harm below))). Of course, application of those factors presupposes knowing what the owner of the putative trade secret claims to be at issue.

Stripping away its generalities, a review of SoftWriters' briefing reveals only two minor references to any claim of protectable trade secret information and supporting factual development, and both center on the SQL Server database. They are:

1. The Framework® product is a total pharmacy management software solution created specifically for the unique processes of pharmacies servicing long term care facilities, assisted living facilities, group homes and the like. The Framework® software stores information in a relational database. *The design and structure of the database, along with the software contained in it, are of SoftWriters' own design and constitute valuable trade secrets*. Rec. Doc. 10 at 5, Statement of Facts (emphasis added).

2. Here there can be no doubt that *SoftWriters' Framework® database constitutes a trade secret*, and that Integra has knowingly misappropriated it. 12 Pa.C.S. §5302. SoftWriters' trade secrets relate to its database architecture[] and *more particularly the manner in which SoftWriters has created a software solution and database architecture to provide features and functionality that are unique in the industry and that represent a significant market advantage. … Id.* at 7 (emphasis added).

Especially in the context of a third-party database (SQL Server) that contains industry standard information, these claims are unacceptably sweeping. Considering the factors found in *SI Handling* in conjunction with the heavy burden the moving party bears

13

when seeking injunctive relief, SoftWriters utterly fails to carry the required burden.

SoftWriters has not put forth any evidence that would, for example, (1) differentiate the information contained in its Framework database – developed via SQL Server, a commonly used and well-known relational database system licensed by Microsoft – that is supposedly secret from what is generally known throughout the industry about such SQL databases, or (2) if there is such secret information, demonstrate the independent value SoftWriters derives from the use of proprietary aspects, if any, of the Framework database. Further undercutting SoftWriters' position, its License Agreement does not mention the term "relational database" or protection of the information contained therein, and a reasonable reader of that agreement can at least pose the question of whether, given the definitions of "Confidential Information" and "Software," any restriction whatsoever applies to a customer's export of its own SCRIPT 10.6 data.

In an analogous situation, the Ninth Circuit, in *MAI Sys. Corp. v. Peak Computer, Inc.*, found permanent injunctive relief unwarranted pursuant to a party's misappropriation of trade secrets claim where that party failed to identify with specificity the trade secrets through its papers, deposition testimony, or its declaration. 991 F.2d 511, 522-23 (9th Cir. 1993) (applying California Uniform Trade Secrets Act, which is nearly identical to PUTSA). The plaintiff's generic allegations to describe its diagnostic software did not specifically define its trade secrets, and therefore, the Court overturned the lower court's grant of a permanent injunction. *Id.; see also, MCQ's Enterprises*, 2007 WL 127728, at *6 (denying TRO on same grounds). Likewise, here, the

14

Court and Integra are left to guess what portion of Framework or its database, or what other information, is at issue in this case and why it is protectable under PUTSA.

Solely for failure to identify any trade secrets, SoftWriters' motion and accompanying and invasive request for premature discovery should be denied.

> **2.**     *SoftWriters fails to identify any misappropriation by Integra.*

Another glaring chapter missing from SoftWriters' work of fiction is any evidence of misappropriation. Broadly speaking, PUTSA protects against two categories of activity: (i) the acquisition of a trade secret by improper means or (ii) the disclosure or use of a trade secret without consent under certain conditions. *Nicolo v. Patterson Belknap Webb & Tyler*, LLP, No. 2:13-CV-706, 2014 WL 1248034, at * 5 (W.D.Pa. Mar. 26, 2014) (citing 12 Pa.C.S. § 5302 (defining misappropriation)).

Here, even if there is a trade secret hidden somewhere in an otherwise generic and functionally-arranged SQL Server database, Integra did not even *access* it, much less acquire it, whether directly from SoftWriters or from any mutual customer. SoftWriters' wild speculation aside, the only data that the Reader transfers is customer-owned, industry-standard prescription data that is widely disseminated through a number of programs and communication mediums, of which Framework is just one provider. When installed by the customer, the EDIFACT reader operates on the client's server, automatically reading one field of data (10.6) from one database into another. Logically, since Integra acquired no trade secrets, cannot have used or disclosed any.

And even assuming that the Reader had the ability to access any other field of

the Framework database, also missing is any evidence of "improper means"[10] connected to the Reader: the customer communicated that it wanted to share data and that it had permission, and Integra had no reason to believe otherwise. Integra first heard, in late August 2015, from one its customers that SoftWriters had complained of a potential violation of that agreement based on the customer's use of the Reader.

SoftWriters attempts to repair this problem by suggesting it was somehow self-evidently improper for the customer to move 10.6 data from one software program to the other, i.e., that Integra should have known of the supposed restriction when allowing a customer to install the Reader. *See* Rec. Doc. 10 at 7 (alleging that "Integra cannot plausibly plead ignorance"). That is decidedly not the case, for two reasons. First, Integra's License Agreement for the EDIFACT Reader contained a warranty by the customer that it had rights to transfer all information necessary for the customer to operate the Reader as intended. Based on this agreement, Integra was assured by the customers that any information exchanged during the install and thereafter was properly disclosed to Integra. Such a warranty makes sense: if anything, what is "implausible" is that a pharmacy software vendor like Framework, who publicly supports interoperability, would be, in reality, seeking to hinder the very same function by its customers.

And second, we now know that the language in the actual SoftWriters license agreement does not appear to support SoftWriters' interpretation. A SoftWriters

---

[10] PUTSA defines improper means to include, but is not limited to, "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." 12 Pa.C.S. § 5302.

16

customer is allowed to use Framework to process its own information. Rec. Doc. 10-2 at 2, *Restrictions on Use* (providing "Licensee agrees to use the Software and the Documentation… only for the processing of Licensee's own data."). Further, SoftWriters impliedly anticipated that third-party agents and contractors will be exposed to SoftWriters' confidential information when it included the provision requiring those third-parties to maintain the confidentiality of SoftWriters information. *Id.* at 2, *Licensor Confidential Information*. Thus, this license agreement contemplates that a customer would be permitted to engage Integra, a contractor in this scenario, to assist the customer in implementing the EDIFACT Reader to transfer the customer's own e-prescription data. The unspecified nature of its trade secrets aside, this language raises the question of whether SoftWriters' claims would survive a motion under Fed. R. Civ. P. 12(b)(6).[11]

Integra was not and is not accessing SoftWriters' alleged trade secret information through the EDIFACT Reader. Nor, for that matter, are the mutual customers when they install the Reader to transfer their own prescription data to use in any fashion they choose. It is difficult on these facts to see how SoftWriters could state a viable claim for breach of license, let alone for trade secret misappropriation.

In citing to *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 393 (3d Cir. 2013) (rev'd on other grounds), SoftWriters only

---

[11] And if SoftWriters' claim for trade secret misappropriation – really a disguised claim for breach of their license agreement by its customers – could not survive a motion to dismiss, it should not satisfy the much higher standard for injunctive relief. *See, e.g., Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 778 (D.N.J. 2013) (noting considerably higher standard for injunctive relief than surviving motion to dismiss).

acknowledges the weakness of its argument. *Conestoga* would allow for relaxation of the required strong likelihood of success showing where the other factors (including third-party interests and public considerations) strongly favor the movant. And they must do so *uniformly. See Constructors Ass'n of W. Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978) (cited in *Conestoga*) ("[i]n contrast, where the threatened irreparable injury is limited or is balanced to a substantial degree by countervailing injuries which would result to third parties, or to the public interest from the issuance of an injunction, 'greater significance must be placed upon the likelihood that the party will ultimately succeed on the merits of the litigation.'"). As discussed below, SoftWriters has not shown that irreparable harm, interests of third parties or public consideration "strongly favor the moving party;" therefore, SoftWriters has essentially pointed out its own deficient arguments without being entitled the relaxed standard mentioned in *Conestoga* and *Constructors Ass'n*.

Because SoftWriters fails to make a <u>*clear*</u> showing that Integra acquired, disclosed, or used its trade secret information by improper means, knowingly or otherwise, its request for temporary injunctive relief should be denied.

**B.      SoftWriters fails to demonstrate any irreparable or immediate harm.**

SoftWriters cannot show it will be irreparably harmed by the (unproven) misappropriation of its (still unidentified) trade secrets, as it is required to do by clear evidence. *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) ("In order to demonstrate irreparable harm[,] the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." (citations

18

omitted)); *Ameriprise Fin. Servs., Inc. v. Koenig*, No. CIV.A. 11-6140-NLH, 2012 WL 379940, at * 7 (D.N.J. Feb. 6, 2012) (citing *Cambell Soup*, 977 F.2d at 91) (plaintiff has the burden of proving a "clear showing of immediate irreparable injury"). Even assuming customers' use of the EDIFACT Reader represented some form of actionable harm, there is not, and has never been since this lawsuit was filed, any urgency. Indeed, from Integra's perspective, SoftWriters' chief complaint is a moot one, since Integra is no longer installing the EDIFACT Reader. Further, Integra has also uninstalled the Reader from all but three customer systems. As to these three customers, any continued use presents no harm to SoftWriters. As noted above, the Reader does not extract any trade secret information, and, in any event, SoftWriters' intended update to encrypt the 10.6 data has or will render the Reader inoperable.

What SoftWriters is really arguing is not misappropriation, but merely supposed ongoing *access* that gives rise to a fear of misappropriation. But this allegation does not satisfy its burden; SoftWriters must demonstrate some actual harm from the use or dissemination of its trade secrets, not just possession. *See De Lage Landen Operational Servs., LLC v. Third Pillar Sys., Inc.*, 693 F. Supp. 2d 423, 431 (E.D.Pa. 2010). In other words, SoftWriters must show more than a *risk* of irreparable harm. *Scholastic Funding Grp., LLC v. Kimble*, No. CIV A 07-557, 2007 WL 1231795, at *8 (D.N.J. Apr. 24, 2007) (emphasis in original) (citing *Continental Group, Inc. v. Amoco Chem. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980); *see also, CentiMark Corp. v. Jacobsen*, No. CIV.A. 11-1137, 2011 WL 5977668, at *12 (W.D.Pa. Nov. 29, 2011) (denying injunctive relief where there was no evidence of inevitable, likely, or substantial threat of disclosure of the trade secrets at

19

issue)). As important, Softwriters' "Trojan horse" theory is unfounded: Integra does not have any trade secrets in its possession or ongoing access to any. The EDIFACT Reader is not a spying program intended for SoftWriters' protected information. The Reader reads and transfers only one data field: e-prescription information in NCPDP 10.6 format. Belonging to the customer, this 10.6 data is widely used and disseminated throughout the industry, is standardized pursuant to federal regulation, and most certainly cannot constitute SoftWriters' trade secret information. And this information is for the customer's own use; Integra does not receive nor has it ever sought out any information about Framework.

But SoftWriters adds even more speculation. Supposedly, if Integra does possess or have some access to SoftWriters ' "most valuable [unidentified] trade secrets," the risk of harm is substantial because Integra had announced a competing product, Nextra, in the pharmacy information system marketplace. In other words, having made a bogus claim that Integra would have acquired unidentified trade secrets, SoftWriters now speculates that if such acquisition had occurred, the phantom trade secrets might be used in another product (Nextra) and/or even disclosed to an entirely separate corporate affiliate (QS/1). This speculative piling on is baseless; SoftWriters fails in its papers to identify a shred of evidence indicating that Integra has obtained, used, disclosed, or imminently plans to disclose to anyone the supposed SoftWriters' trade secrets that Integra, in any case, does not have. *See CentiMark*, 2011 WL 5977668, at *12.

Because SoftWriters has not made a _clear_ showing of any exigent circumstances to support its vague allegation of immediate or irreparable harm related to the

20

misappropriation of trade secrets, past or present, injunctive relief should be denied.

### C.   The balance of harms weighs against SoftWriters.

Although at most three customers are currently using the EDIFACT Reader to transport information from Framework to DocuTrack, SoftWriters asks the Court to require Integra to shut down the *entire* eRX module.[12] Apart from the fact that it does not access any Framework database information, the eRX module is a separate software product of which the EDIFACT Reader is a minor and optional part. Approximately 60 customers use the eRX module within DocuTrack (as opposed to the approximately sixteen (16) that ever installed the EDIFACT Reader and the only three who any longer have any ability to use the Reader).

When deciding a motion for injunctive relief, courts must assess whether granting the relief will cause greater harm to the nonmovant. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 703 (3d Cir. 2004). And courts are to apply heightened scrutiny when weighing the possible harm to other interested parties, like the parties' mutual customers. *See Punnett*, 621 F.2d at 587. The potential harm here from the relief SoftWriters seeks is pronounced. An order that forces Integra to deactivate the eRX module for all of its customers, regardless of their use of the Reader, would be far more harmful to Integra's business, reputation, and good will in the industry than any injury

---

[12] Seemingly, SoftWriters realized the overbreadth of its claim for relief concerning the eRX module as evidenced by a comparison of SoftWriters' Motion and Proposed Order. Rec. Doc. 10; 10-5. In the order, SoftWriters significantly limits its request to disabling only the "DAS" or EDIFACT Reader portion of Integra's eRX module. While a recognition of its error in seeking to shut down eRX in its entirety, this error also demonstrates SoftWriters has rushed into this Court with incomplete understanding of and support for its most crucial claim.

to SoftWriters, which Integra has already shown to be nonexistent. *MedSpring Grp., Inc. v. Feng*, 368 F. Supp. 2d 1270, 1280 (D.Utah 2005) (injunction inappropriate where the defendant would lose clients, market power, and credibility within the trade).

But the real impact is on customers using the e-prescribing information, and the patients they serve. *All* eRX customers would be harmed in the process, not just those remaining users of the EDIFACT Reader. *See Punnett*, 621 F.2d at 587 (the court should apply heightened scrutiny to such third-party harm). Concerning these institutional patients, the Court can well imagine they are in many cases not capable of managing their healthcare themselves and thus are completely reliant on the service provided by the institutional pharmacy, e.g., the accurate and complex intake, dispensing, delivery and billing of a variety of prescription drugs for patients under the terms of various contracts and reimbursement plans. That SoftWriters would cavalierly ask the Court to simply shut down a customers' ability to manage e-prescriptions—which is the gist of the relief it seeks in asking that the EDIFACT Reader be deactivated—reveals that SoftWriters' interests lie elsewhere than with avoiding harm.

Even as to the three customers that may still be using the EDIFACT Reader, any precipitous deactivation without their permission could cause them to suddenly be denied access to their own e-prescription data, thereby harming many of the patients in these settings.

Thus, the balance of harms, and in particular the impact on third party customers and the patients who depend on their accurate and ongoing services, weighs heavily in favor of denying injunctive relief.

22

**D.**     **SoftWriters seeks relief contrary to the public interest in  facilitating exchange of health information across disparate systems.**

Finally, SoftWriters' main objective—to selectively limit interoperability of its Framework program with other healthcare systems and in particular, to be able to wall off e-prescribing data—contravenes the public interest. In discussing our national health technology infrastructure, the Office of the National Coordinator for Health IT has referred to the vision of "interoperability health IT ecosystem [that] makes the right data available to the right people at the right time across disparate products and organizations in a way that can be relied upon and meaningfully used by recipients."[13] In contravention of this regulatory and policy objective, SoftWriters would impose restrictions, dressed up as trade secrets claims, on free flow of health data through disparate software systems. Moreover, by impeding interoperability in the specific context of electronic prescribing, SoftWriters' actions threaten the goal of smooth and accurate dispensing activity and reducing e-prescribing errors. Any claim of trade secret protection or requested injunctive relief that would attempt to silo 10.6 data, whatever the purpose, should be rejected at this stage in the case.

Relatedly, if the EDIFACT reader or similar interfaces disappear (or are available only at the competitive whim of a vendor handling substantial amounts of data), e-prescribing technology stakeholders will lose an important means of communication. That in turn would impoverish customer choice among products and have a direct and

---

[13] Connecting Health and Care for the Nation, A Shared Nationwide Interoperability Roadmap, https://www.healthit.gov/sites/default/files/nationwide-interoperability-roadmap-draft-version-1.0.pdf (last accessed on Oct. 28, 2015).

indirect effect on public health. "[Courts] have recognized that the public interest factor weighs heavily when an injunction would have a potentially adverse effect on public health." *Bianco v. Globus Med., Inc.*, No. 2:12-CV-00147, 2014 WL 1049067, at *11 (E.D.Tex. Mar. 17, 2014) (citing, *inter alia, Conceptus, Inc. v. Hologic, Inc.*, 2012 WL 44064, at *3 (N.D.Cal. Jan. 9, 2012) (declining to enjoin defendants where removal of a product from the market would harm patients and eliminate a valuable alternative)).

SoftWriters' interests – forcing customers to choose its Framework product and controlling the transmission of health data that it does not own – are insignificant by comparison. Also, of course, the public interest is not served by granting injunctive relief based on a claim with "scant likelihood of success." *Krichbaum v. U.S. Forest Serv.*, 991 F.Supp. 501, 507-08 (W.D.Va. 1998).

Based on the public's interest in efficient, mistake-free prescription exchange, as represented by institutional pharmacy systems interoperability, this last factor, too, weighs against the requested injunctive relief.

### E.      No Good Cause Exists for Expedited Discovery.

Courts in this Circuit have utilized two tests to analyze whether expedited discovery is warranted: the injunctive relief test and the test for good cause. *Entm't Tech. Corp. v. Walt Disney Imagineering*, No. CIV.A. 03-3546, 2003 WL 22519440, at *2 (E.D.Pa. Oct. 2, 2003); *Better Packages, Inc. v. Zheng*, No. Civ.A 05–4477, 2006 WL 1373055, at *3 (D.N.J. May 17, 2006). Integra has already shown SoftWriters' deficiencies as to injunctive relief and incorporates by reference all of the arguments set forth above to contest SoftWriters' request for expedited discovery under the first test.

24

With regard to the second standard, the record is devoid of any evidence that would support "good cause." SoftWriters' requests for production and interrogatories extend well beyond the allegations in the Complaint. Compare, Rec. Doc. 1, 10-8. Without a clear definition of the trade secrets in question, discovery should not be permitted, much less on an expedited basis. *DeRubeis v. Witten Technologies, Inc.*, 244 F.R.D. 676, 680-81 (N.D.Ga. 2007) (delaying trade secret discovery is appropriate until the plaintiff has sufficiently described the trade secret at issue). Given the competitive designs of SoftWriters and its parent Roper, the need for that definition, and appropriate and carefully crafted limits even on ordinary track discovery, is especially important. At present, the request for expedited discovery is unwarranted and should be denied.

## IV.    CONCLUSION

Its competitive agenda plain, SoftWriters falls far short of any <u>clear</u> showing of a likelihood of success under PUTSA, or of any urgent and irreparable harm to be addressed. At the same time, SoftWriters fails to acknowledge the significant, detrimental impact its broad and unjustified requested relief (switching off their e-prescription capability) would have on the parties' joint-client base. Suddenly disabling their content management for e-prescriptions would negatively impact operations and numerous patients and their care, in service of objectives that undercut healthcare systems interoperability. Consequently, SoftWriters motion should be denied in its entirety.

DATED this 28th day of October, 2015.

Respectfully submitted,

REED SMITH LLP


/s/ *Kirsten R. Rydstrom*
Kirsten R. Rydstrom (SBN 76549)
Email:    krydstrom@reedsmith.com
Pa. ID No. 76549
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222-2716
Telephone: +1 412 288 7284
Facsimile: +1 412 288 3063

-and-

ARNALL GOLDEN GREGORY LLP
Kevin B. Getzendanner
Georgia Bar No. 292425
Email: kevin.getzendanner@agg.com
Anuj Desai
Georgia Bar No.
Email: anuj.desai@agg.com

171 17th Street NW
Suite 2100
Atlanta, Georgia 30363
Tel: (404) 873-8500
Fax: (404) 873-8501
*Admitted Pro Hac Vice*

*Counsel for Defendants J M Smith Corporation
and Integra LTC Solutions, LLC*

## CERTIFICATE OF SERVICE

I certify that today I filed electronically the foregoing Defendants' Opposition to Plaintiff's Motion for Temporary Restraining Order and Request for Preliminary Injunction Hearing. Notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system.

Date: October 28, 2015

/s/ *Kirsten R. Rydstrom*
Kirsten R. Rydstrom

*Counsel for Defendants J M Smith Corporation and Integra LTC Solutions, LLC*